IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GRASS VALLEY TERRACE, )
A CALIFORNIA LIMITED )
PARTNERSHIP, et al., )
)
Plaintiff, )
)
vs. ) No. 98-726C
) (Chief Judge Damich)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF

GLEN KOTHE

Taken April 27, 2004
Commencing at 10:30 a.m.

REPORTED BY: DEBORAH A. MAVES, RPR

PARADIGM REPORTING & CAPTIONING
1400 RAND TOWER
527 MARQUETTE AVENUE
MINNEAPOLIS, MINNESOTA 55402
612-339-0545 * 1-800-545-9668 * Fax: 612-339-5575



Deposition of GLEN KOTHE taken on the 27th day of April 2004, commencing at 10:30 a.m. at the law firm of FAEGRE & BENSON, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, before Deborah A. Maves, Registered Professional Reporter and a Notary Public of and for the State of Minnesota.

**********

APPEARANCES

On Behalf of the Plaintiff:

MARK J. BLANDO, ESQ.
ROBERT W. VACCARO, ESQ. (p.m. only)
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
612-766-1600

On Behalf of the Defendant:

KENNETH KESSLER, ESQ.
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division, Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
202-307-0313

Also Present:
David Lohse, law student (a.m. only)

NOTE: The original transcript will be delivered to Kenneth Kessler, Esq., as the taking party of the deposition.



INDEX

PAGE

EXAMINATION BY:
Mr. Kessler .................................. 5, 173
Afternoon Session .............................. 69
Mr. Blando ..................................... 169

OBJECTIONS BY:
Mr. Blando: 19, 36, 57, 65, 73, 74, 77, 85, 86, 87, 88, 90, 94, 98, 100, 102, 105, 133, 134, 139, 140, 143, 145, 149, 150, 152, 163, 168, 169, 177
Mr. Kessler: 171

EXHIBITS MARKED AND REFERRED TO:
15 Declaration of Eileen R. Kothe (APP.30-60) .............................. 79, 132

16 6/10/93 letter to Mr. William Slininger from Darrel and Glen Kothe (GV 2309-2338) 110, 123, 160

17 5/23/94 letter to William Slininger from Darrel and Eileen Kothe (GV 2295) .................... 119

18 D & G I Exhibit D (GV 2296-2298) ............. 121

19 4/38/00 Promissory Note (GV 2149-2151) ........ 124

20 Real Estate Mortgage for Minnesota (GV 2152-2157) ............................... 125

21 5/23/94 letter to William Slininger from Darrel and Eileen Kothe (GV 2756-2759) .............. 125

22 Worksheet for Incentive Calculations (GV 2716-2717) ............................... 127

23 7/19/99 Loan Agreement (GV 2642-2645) ......... 128



EXHIBITS MARKED: (Continued)

24 Payment option selection (GV 2272) ............ 130

25 4/22/98 letter to Eileen Kothe from Lenee J. O. Hoffman (GV 2267-2269) ................... 131, 138

26 7/13/99 letter to Eileen Kothe and Shannon Guarneros from Lenee Hoffman (GV 2257-2258) ... 131

(Original exhibits attached to original transcript. Copies attached to transcript copies.)

EXHIBIT C

GLEN KOTHE,
duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. KESSLER:
Q. Good morning, Mr. Kothe.
A. Good morning.
Q. My name is Kenny Kessler, I work for the Department of Justice. We're here for a deposition in the case of Grass Valley versus United States.
A. Hm-hmm.
Q. The way we're going to work today is I ask the questions and you provide the answers under oath. Do you understand that part?
A. Hm-hmm.
Q. Have you ever been deposed before?
A. Yes.
Q. And when was that?
A. Many years ago. I couldn't give you a specific.
Q. How many times have you been deposed?
A. Oh, maybe three or four.
Q. Okay.
A. You know, over a 30-odd-year period.
Q. Have you ever testified at trial?
A. Yes, many times.
Q. Many times, okay, we'll get to that.



All right, then you should be familiar I would imagine, very familiar with the arrangement here?
A. Pretty much, yeah.
Q. And one of the things I want to just remind you for the benefit of the court reporter is that we make sure we don't speak over each other, that you let me finish my question before you answer and I'll do the same thing with you.
A. Right.
Q. And if there's any question you don't understand, please let me know and ask me for clarification. I don't want you to answer a question you don't understand. If at any time you need to clarify an answer or elaborate on something that comes to your mind later, please do, because we want to make sure that you get all your information out that you want to at this time.
A. Okay.
Q. Just give me an idea of what type of cases you've been deposed in previously.
A. The majority of them were criminal cases. There were a couple of civil actions and things like that, but the majority of them were criminal cases.
Q. In what capacity were you deposed, what was your role?



A. I was a law enforcement officer. I was the investigating officer in every one of them.
Q. Where was that?
A. St. Paul.
Q. So you worked for the St. Paul Police Department?
A. Yes. I don't anymore, but, I mean, at the time I did.
Q. All right. And were any of your trial testimonies civil or were they all criminal?
A. There were a few civil ones. The majority of the cases that I investigated that went to civil court generally were settled on the way in the door type thing, but the ones that I did testify to were relatively few. The majority of them were criminal cases.
Q. Have you ever testified either at trial or in a deposition that was not related to your position as a law enforcement officer?
A. No.
Q. And when did you retire from that line of work?
A. 1997, June of '97.
Q. And what did you do after that?
A. My wife and I own a large dog training school and --



Q. Dog training?
A. Dog training.
Q. Okay.
A. And so that's what we've been doing ever since. Actually we were doing it before I retired, but, I mean, that was our sole thing since I retired.
Q. And you're still doing that today?
A. Yup.
Q. And do you consider that your sole means of income, your primary means of income?
A. No, I get a pension from the police department and then also I get a small income from when my mother died, it's like 800 some dollars a month. It's part of her, I think it was her IRA that provided it. Each one of my brothers and sisters get the same amount, and that was based out over a five-year period.
Q. And you're here in connection with I believe two properties that have been operating in connection with the, what used to be the Farmers Home Administration Rural Housing projects?
A. That's correct.
Q. Call it D & G I and D & G II?
A. That's correct.
Q. Are there any other properties that are similarly involved with the government that you or your

9

family's involved in?
A. No.
Q. What I'm going to do in the deposition is I'm going to start out getting some background information about your involvement, since you've been identified as a probable witness at trial, if there's a trial, and get general, as much information as I can about your properties, your parents' properties, because I haven't had a chance to sit down with anybody previously to discuss it so this is the opportunity for the government to get that information and for you to tell your story and for us to take it down.
A. Okay.
Q. I'll start out trying to get background information. If it sounds like I don't know something it's because I don't know something and that I'm truly asking. And I don't necessarily know everything I'm going to ask.
And then I've got some documents that are related to the properties and we'll get to those at some point.
As an initial matter, if you could, give me an idea of what your involvement is with these properties.
A. Initially in 1974 my father and I entered into a

10

partnership -- he was an 85 percent holder and I was 15 percent holder -- to build D & G I. And then in 1979 we added D & G II. And over the course of the years and everything, they operated, you know, as such.
And then in '94 I opted out of the partnership and my mother replaced me. And then after my parents died I was the personal representative for the estate and so I kind of inherited everything back.
Q. So are you an owner or I mean --
A. Well, I'm the general partner -- my mother, my parents had created what's called -- I've got to always think of the title -- it's the Kothe Family Limited Partnership or something like that and I am the general partner. My brothers and sisters, we are all partners in it and I am the general partner. I'm the one that's responsible for conducting business for the family partnership.
And also I was the trustee or personal representative for my mother's estate, and as part of the will and so forth and the trust agreements, all of her properties and everything were transferred to the family partnership, which included at the time D & G I and II.
Q. So D & G I and II are a part of the family partnership or owned by the family partnership?

11

A. Yeah, it's still -- D & G I and II are still a partnership, but they're kind of -- I refer to them as a subsidiary of the Kothe family partnership. I mean, I don't know any other way to put it. They're a separate entity, but they come under the other one's control.
Q. I should have asked you how you spell your name when you first started. Can you spell your name for me, please?
A. K-o-t-h-e.
Q. And how about your first name?
A. Glen, with one N.
Q. Thank you.
Can you give me the names of your brothers and sisters that are also in the partnership, your partners in that partnership?
A. In the Kothe family partnership?
Q. Yes.
A. Let's see, my sister is Maureen Collette, C-o-l-l-e-t-t-e; and then Jeanne Shaw, S-h-a-w; Alan, A-l-a-n, Kothe; and Shannon Guarmeros, and don't ask me to spell that because I've never been able to get it right. It begins with a G, that's all I can tell you.
Q. I've seen her name. We'll come across it.
A. She actually ended up to be a one percent -- after my father's death and through some things that my

12

mother had found out later on and everything that had to do with something with the partnership, Shannon was put on as a one percent holder. There was apparently some confusion after my dad's death and everything that, you know, about the partnership that there had to be two people. So Shannon was thrown on there as a one percent holder.
Q. Is there anybody else who is a partner in the Kothe family partnership that you didn't just name?
A. Other than myself, no.
Q. And if you could, I haven't seen the properties, can you try to paint a picture for me about where -- I know there are eight units -- what type of area they're located in and what they look like in your mind?
A. Well, they're located in Princeton, Minnesota, which is roughly, oh, about an hour's drive from here north, kind of northern direction from the metro area.
They're side by side, their addresses are like right next to each other. They're two-story buildings with four units on each floor. Well, technically they're three story I guess you'd call them, the way they're built. But anyway, there's seven two bedroom and one one bedroom in each building.
And Princeton itself is a, I guess you'd call it a small town type thing that's growing very

rapidly in the northern -- I guess it's still part of the northern metro. It's along what's known as the North Star Corridor here, which is a big development area. They're talking about putting in commuter rail and all kinds of things like that. And so consequently, the area is tending to grow faster and faster. A lot of people are moving in the general area and then commuting to the metro.
Q. Okay.
A. And so it's -- but the city of Princeton itself is basically what I would classify as a small town type thing. I think their population is someplace around 15, 20,000, something like that, I'm not sure.
Q. When did you build these apartments?
A. The first one, D & G I, was in '74 and D & G II was in '79.
Q. Now, would you describe yourself as the most knowledgeable person, most involved person in the administration of these two properties from the partnership's standpoint?
A. From the partnership's standpoint I guess yes. I'm the one that basically deals with the paperwork and stuff like that. The management company handles the day-to-day operations and stuff like that and I get monthly reports and stuff like that. That's currently



my basic knowledge.
Q. Okay. All right. I'd like to explore how the management company works. Can you give me an idea of what their responsibilities are and what's your arrangement with them?
A. Well, originally the management company took over in I believe it was 1998 after my father died. My mother used to be the bookkeeper, she took care of everything.
After my father died she didn't want to do it anymore so she hired a management company by the name of Security Management. And it's my understanding that their job is to manage the buildings. They collect the rent, they take care of all the accounts, they make sure that any repairs are taken care of, the bills are paid and so forth, and they send monthly reports on what's been happening and things like that.
Every month I get, I don't know, a couple of packets about as thick as this right here and it's got all kinds of information in it, half of which I'm not sure about. And it's basically financial stuff. It shows what was spent, how much is left in each account, you know, things like that.
Q. Okay, tell me more, if you could, please, what you recall is in the report.



A. Well, it will say what the reserve account was at the start of the month, what it is at the end of the month, what expenditures were done for whatever, you know, bills were paid, any kind of expenditures for repairs or maintenance or anything of that such. And pretty much it. I mean, there's a lot of zeros that appear on it because they have different accounts listed. It's like an accountant's ledger sheet almost.
Q. Is there nonfinancial information as well such as vacancy rates or number of vacant apartments?
A. Well, I've never seen any in there primarily because I've never seen any vacancies. So I'm assuming that if there were a vacancy, something would appear on the report, but I've never seen one on the report because as far as I know there's never been a vacancy, you know, for other than a few days probably.
Q. All right. And what do you find to be the most helpful about that report that sticks out in your mind?
A. Just so I know everything is operating smoothly and I don't have to have a headache. That's my primary concern. I've got enough to do without having to add to it. That's the management company's job is to take some of the headache off of me.
Q. And does the management company report to any of the other partners or just you?



A. Just to me. I believe my sister Shannon does get a copy of the report too because she was originally listed as a one percent owner so I think she gets copies of it. But that's in the process of being changed since my mother's death and everything and all the paperwork involved in transferring responsibility, ownership and all that other stuff, all the paperwork that's involved in it.
The lawyer that is handling that for me is a gentleman by the name of Cy Northrop, who's located down in Tulsa, Oklahoma, and he works with the financial adviser to the family partnership.
Q. One more thing I forgot to remind you of is if you need a break, please just let us know. We can take a break whenever you need.
A. Okay.
Q. What did you do to prepare for your deposition today?
A. I reviewed the historical records that were provided for me by my attorneys.
Q. Which documents do you recall seeing?
A. Oh, the original application, I guess you'd call it, for the buildings, the notes for the loans, some financial records, various other paperwork that I'd never seen before. I believe they were documentation

45

couple kids.
Q. Okay. So I'm just trying to see if I've got this correct. You think that currently the tenant population has aged?
A. Yes.
Q. And do you have, currently have any vacancies in your D & G apartments?
A. No.
Q. Is there a name, you know, on the street that's a different name than D & G Apartments? Are they called D & G Apartments in the phone book?
A. Yes, right out in front of the building there's a sign that says "D & G Apartments."
Q. Somebody driving up would see just one apartment complex or does it look like two?
A. It's two separate buildings and then there's kind of a common area between the buildings with a sidewalk there and then there's the sign -- actually there's a driveway that goes between the two buildings that goes back to the parking lot in the back, and right next to that driveway is a sign that's, oh, I want to say it's four feet across in big letters it says, "D & G Apartments."
Q. And you said there's no vacancies?
A. No.

46

Q. When's the last time there was a vacancy?
A. I don't recall ever hearing about a vacancy.
Q. Is it possible there was a vacancy and you didn't hear about it?
A. Anything is possible, but I'm sure I would have heard about it at one time or another. But I know they always had a waiting list of people.
Q. That's what I was getting at, if there was a vacancy, you'd think you would know about it, right?
A. Right. To my knowledge, it's been a hundred percent for as long as they've been there. You know, other than, you know, a few days, somebody moves out, somebody moves in, which didn't happen very often.
Q. When's the last time you recall somebody moving out?
A. Being as that I was not directly involved in the building since '94 till my mother died and I got them back, I don't know of any at all. I don't know if anybody's ever moved out. Because I was not directly involved in it between '94 and my mother's death.
Q. Which was in 2001?
A. Yeah.
Q. So since -- it's 2004 today. So since 2001 you don't recall of anybody moving out of D & G Apartments?
A. I've never been informed of it at all.

47

Q. And is it possible that somebody's moved out and you didn't know about it, or would you know about it?
A. I suppose it's possible, you know, the management company, somebody moved out and they moved somebody else in, I suppose it's possible, but they never -- that would be something that I wouldn't necessarily have to know. I mean, if there was going to be a vacancy for a couple or three months, I'd want to know that, but then they've never informed me of anything like that.
Q. So in contrast to a vacancy where you would know if something was vacant for three or four months --
A. Right.
Q. -- you would know, but if a tenant moved out and another tenant moved in a couple days apart, you wouldn't necessarily know that?
A. No. Not unless I happened to specifically be talking to somebody at the management company and they said, "Oh, by the way, we got a new tenant."
Q. What's the name of the person at the management company who would know the answer to that type of question?
A. Oh, my mind just went blank. I want to say Jolie or Jolene. I can't think of her name now.
Q. Okay, if it comes to you, if you could let me

48

know, I'd appreciate it. Any guesses on her last name?
A. I don't know if I've ever heard her last name.
Q. Is this person, this Jolene you're trying to think of, is this the person you would call if you had questions?
A. Yeah, yeah. I'm sure I have it written down at home someplace.
Q. So is it fair to say that you would not be aware of how many people have moved out of D & G Apartments in the last year?
A. In the past year?
Q. Yes.
A. To my knowledge, none have, but, you know, it's possible that there may have been one or two, but I doubt it, because their turnover rate -- historically our turnover rate was never very high.
Q. What about -- now, I understand that you don't keep track all the time since your mother passed away. Prior to that would you have known of people leaving the apartment?
A. As a rule, no, because I wasn't directly involved. I was no longer a partner after '94.
Q. So if I take any number of years, three years or five years or ten years, and ask if you knew the turnover rate or how many people had left, would you